United States District Court
Southern District of Texas

**ENTERED**

August 12, 2019

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PAMELA MILLER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:18-CV-1519 |
| | § | |
| ANDREW SAUL[1], | § | |
| Commissioner of Social | § | |
| Security Administration, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge in this social security appeal is Plaintiff's Motion for Summary Judgement (Document No. 15) and Defendant's Cross Motion for Summary Judgment (Document No. 13). Having considered the cross motions for summary judgement, the parties' briefing, the administrative record, the written decision of the Administrative Law Judge, and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that Plaintiff's Motion for Summary Judgment be GRANTED, Defendant's Motion for Summary Judgment be DENIED, and the decision of the Commissioner be REMANDED for further proceedings.

## I.     Introduction

Plaintiff Pamela Boyd Miller ("Miller") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. §405(g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of the Social Security Administration.

her claim for disability insurance benefits under Title II of the Social Security Act 42 U.S.C. § 1382. Miller argues in three points of error: (1) that the ALJ's decision that she is not *per se* disabled under Medical Listing 4.02, 12.04, and 12.06 is not supported by substantial evidence; (2) the ALJ improperly determined her residual function capacity; and (3) the ALJ failed to apply the lower rule which directs a finding of disability when the claimant's exertional level falls between two levels of the Grid which direct opposite conclusions. The Commissioner, in contrast, argues that there is substantial evidence in the record to support the ALJ's decision, and that the decision comports with applicable law.

## II. Administrative Proceedings

On or about August 23, 2012, Miller applied for Title II disability benefits, claiming that she was disabled since August 9, 2012, due to cardiomyopathy, heart problems, severe anxiety, high blood pressure, high cholesterol, gastroesophageal reflux disease (GERD), and breast cancer (Tr. 10,148, 302-03,356). After the Commissioner denied Miller's application initially and upon reconsideration, Plaintiff requested a hearing (Tr. 122-44, 148, 169-80). The ALJ, Allen G. Erickson, held a hearing on December 5, 2013 and received testimony from Miller and a vocational expert ("VE"). (Tr. 10, 163-54, 227). On July 29, 2014, the ALJ issued his decision finding Miller not disabled (Tr. 145-57).

Miller then filed a request for review of the ALJ's decision, and the Appeals Council remanded the case for further consideration on September 24, 2015. (Tr. 10, 163-74, 227). In so doing, the Appeals Council wrote:

> Under the authority of 20 CFR 404.977, the Appeals Council vacates the hearing decision and remands this case to Administrative Law Judge for resolution of the following issues:

- The hearing decision finds depressive disorder and anxiety disorder are two of the claimant's severe impairments (Finding 3). However, the decision does not reflect an adequate evaluation of their severity or effects pursuant to 40 CFR 404.1520a. The decision states the impairments result in mild restrictions in activities of daily living; mild difficulties with social functioning; moderate difficulties with regard to concentration, persistence or pace; and no episodes of decompensation, which have been of extended duration (Decision, page 5), However, no rationale for these findings was discussed. Further consideration of the severity of the claimant's mental impairments is warranted.

- The decision does not give significant weight to the opinion of Manjeshwar R. Prabhu, M.D., in Exhibit 11F, because it is not supported by objective evidence (Decision, pages 7-8). However, the decision does not describe the objective evidence that would support or refute an opinion concerning mental impairments (*See*, Social Security Ruling 85-16). Subsequently, the decision finds the "non-severe" opinions of the State agency psychological consultants are not entitled to any significant weight. In support of this finding, the decision states, "However, the objective medical evidence as well as testimony support a finding that the claimant's anxiety and depression are 'severe'" (Decision, page 8). This statement contradicts the earlier statement that Dr. Prabhu's opinion is not supported by objective evidence. In addition, there was no attempt to contact Dr. Prabhu for clarification or "more detailed information" (Social Security Ruling 85-16). Accordingly, further consideration of Dr. Prabhu's opinion is warranted (20 CFR 404.1527; Social Security Rulings 96-2p and 96-5p).

Upon remand the Administrative Law Judge will:

- Further evaluate the claimant's mental impairment in accordance with the special technique described in 20 CFR 404.1520a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c).

- Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (20 CFR 404.1545 and 416.945; Social Security Rulings 85-16 and 96-8p). In addition, evaluate all medical opinions, and explain the weight given to such opinion evidence (20 CFR 404-1527 and 416.927; Social Security Rulings 96-2p, 96-5p, and 96-6p). As appropriate, the Administrative Law Judge may request the treating and nontreating sources to provide additional evidence and/or further clarification of the opinions and medical source statements about what

3

> the claimant can still do despite the impairments (20 CFR 404.1520b
> and 416.920b).

(Tr. 164-65).

Following the Appeals Council's order, a different ALJ, Gary J. Suttles, held a hearing on June 14, 2017, at which Miller and a VE testified. (Tr. 80-123).  On August 1, 2017, the ALJ Suttles issued his decision finding, again, that Miller was not disabled within the meaning of the Act. (Tr. 22, Finding 11).  Miller filed a request for review of the ALJ's decision with the Appeals Council, but that request was denied on February 1, 2018, and the ALJ's June 14, 2017 decision became the Commissioner's final decision.  Miller then timely filed this civil action seeking judicial review of the Commissioner's final decision.  The parties have now filed Cross Motions for Summary Judgment, and this appeal of the Commissioner's adverse decision is ripe for ruling. 42 U.S.C. § 405(g).

## III.     Standard for Review of Agency Decision

The courts review of a denial of disability benefits is limited to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards. *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing" when not supported by substantial evidence. 42 U.S.C.§405(g).  While it is incumbent upon the court to examine the record in its entirety to decide

whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "re-weigh the evidence in the record nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the Commissioner's decision." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV.    Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.§ 423(d)(1)(A). The impairment must be proven through medically accepted clinical and

laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied to work.

42 U.S.C. § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

1. If the claimant is presently working, a finding of not disabled must be made;
2. If the claimant does not have a severe impairment or combination of impairments, he will not be found disabled;
3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed, and benefits are awarded;
4. If the claimant is capable of performing past relevant work, a finding of not disabled must be made; and
5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration [her] age, education, past work experience and residual functional capacity, [she] will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this framework, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Id.*; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the

process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

Here, the ALJ found at step one that Miller had not engaged in substantial gainful activity since August 9, 2012, her alleged onset date (Tr. 12, Finding 2). At step two, the ALJ determined that Miller had the following severe impairments: cardiomyopathy, congestive heart failure, anxiety, and depression. (Tr. 12, Finding 3). At step three, the ALJ found that Miller did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments (Listings) in 20 C.F.R. Part 404, Subpart P, Appendix 1, including Listings 4.02, 12.04 and 12.06 (Tr. 13, Finding 4). Then the ALJ evaluated the credibility of Miller's subjective complaints and determined they were not credible to the extent alleged. (Tr. 15-16). The ALJ also determined that Miller retained the residual functional capacity ("RFC") to perform light work because she could lift 20 pounds occasionally and 10 pounds frequently, stand and walk for four out of eight hours, and sit six out of eight hours, she had an unlimited ability to pull, push, and perform fine and gross manipulations; could occasionally twist, crouch, crawl, stoop, bend, squat and balance, could occasionally have exposure to dangerous machinery, uneven surfaces, and heights, and could understand detailed instructions, concentrate and perform detailed tasks, gets along with others, and respond and adapt to workplace changes and supervision. (Tr. 14). At step four, the ALJ determined, based on VE's testimony, that Miller could not perform her past relevant work. (Tr. 21-22, Findings 6). At step five, after considering the VE's testimony, the ALJ concluded that Miller could perform jobs that exist in significant numbers in the national economy, including general clerk, administrative clerk, and distributing clerk (Tr. 21, Finding 10), and that she was, therefore, not disabled within the meaning of the Act. (Tr. 22, Finding 11).

In this appeal, Miller argues that the ALJ errored at step three in failing to find her disabled under Medical Listing 4.04, 12.04 and 12.06, erred in determining her RFC, and improperly evaluated her exertional level.  In determining whether there is substantial evidence to support the ALJ's decision, including their assessment at step three, the Court generally considers four factors: (1) the objective medical evidence; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren,* 925 F.2d at 126.   But, here, a review of the record in connection with the arguments advanced by Miller reveals that it is the ALJ's consideration of the objective medical evidence and his consideration of the opinions of Miller's treating psychiatrist that are problematic, and which require a remand in this case.

## V.     The Record Evidence

What can be gleaned from the medical records is that Miller has a history of breast cancer, hyperlipidemia, cardiomyopathy, congestive heart failure, gastroesophageal reflux disease, depression and anxiety disorder. The record shows that Miller saw Manjeshwar R. Prabhu M.D. ("Dr. Prabhu"), a psychiatrist, to regulate her previously diagnosed anxiety disorder and depression on March 29, 2011. (Tr. 462).  She was prescribed Ambien, Xanax, and Lexapro to manage her symptoms. She returned to his office on September 29, 2011 and Dr. Prabhu reported in both of the appointment notes that Miller was alert and oriented, logical and goal oriented, with grossly intact cognitions and normal behavior. (Tr. 459-61). In December 2011, Miller went to LabCorp for testing which indicated that Miller had high cholesterol with an LDL cholesterol level of 145. (Tr. 481).

In late March 2012, Miller was seen by Dr. J. Raul Soto, M.D. ("Dr. Soto") at the Memorial Hermann Medical Group about issues she was having concerning her heart. (Tr. 477). Overall her left ventricular systolic function was moderately impaired with an ejection fraction between 35-40 percent. After a few months, Miller returned to see Dr. Prabhu, once in July 2012 and another time in August 2012 (Tr. 453-58). Each time Dr. Prabhu reported on her panic anxiety disorder and depression. By the second appointment, Miller reported feeling hopeless, lacking the ability to function, and a desire to quit her job but, but was hesitant to do so because this would cause her to lose her insurance.

On October 9, 2012, Miller had a mammogram at Memorial Hermann Memorial City Imaging Services. (Tr. 494). The results indicated that there was no mammographic evidence of malignancy. In December 2012, Miller had several medical and psychological visits. On December 4, 2012, Miller was seen by Gary H Lee, D.O. from Internal Medicine Consultative Examinations. (Tr.486-88). Her chief complaints were high cholesterol, GERD, fatigue, leg pain while sitting and osteoporosis. She reported only having the capability to carry five pounds for a short distance. Six days later, she was seen by Memorial Hermann Medical Group regarding her tachycardia, left bundle branch block, and cardiomyopathy. (Tr. 472). On December 21, 2012, Miller was seen by Joe Anzaldua MD after two episodes of epistaxis, but Dr. Anzaldua found no evidence of active bleeding or infection. (Tr. 497). Dr. Anzaldua switched Miller's prescription from Crestor to Lipitor for financial reasons. LabCorp tests from that day showed that Miller's cholesterol remained high, with a total cholesterol level of 234 and LDL cholesterol of 145. (Tr. 587).

Medical records from January 23, 2013 indicate Miller was seen by Dr. Sohail Jalal M.D. ("Dr. Jalal") at Memorial Herman Medical Group Cardiology Southwest to discuss the possibility of a pacemaker implant. (Tr. 537-38). During that Miller complained of unprovoked recurrent chest

heaviness with associated lightheadedness for the three weeks leading up to this appointment. She described the chest pain as heavy and sharp, located in the middle of her chest. Two days later, she returned to Dr. Jalal with claims of occasional heart flutter palpitations, dizziness or lightheadedness when she sat or stood, but denied any near syncope episodes. (Tr. 539-40). Miller reported shortness of breath with mild activity and had not been able to go back to work. Dr. Jalal noted that despite the heart failure therapy, Miller's ejection fraction results only rose from the 22 percent reported in March 2010 to 30-35 percent on December 6, 2012. By January 31, 2013, Miller's echocardiogram revealed that her systolic heart function was still severely impaired with an ejection fraction of 30 percent and class III heart failure symptoms. (Tr. 511-13). That same day Dr. Jalal performed a left subclavian venogram and successfully inserted her biventricular pacemaker defibrillator.

When she was discharged from Dr. Jalal's care on February 2, 2013, Miller told Dr. Jalal the pain had subsided and that she was feeling well. (Tr. 533). She had a regular heart rate and rhythm, with no gallops, murmurs, or clicks. She was also prescribed Bactrim double strength and was told to continue her home medications. After two weeks, Miller returned to Dr. Jalal for an incision check. (Tr. 530-32). Miller stated that she noticed improvement with her breathing and was not as short of breath as she was prior to the implant. She denied any chest pain, palpitation, dizziness, leg edema or syncope. Dr. Jalal reported a nicely healed incision, and a dilated comprehensive metabolic panel. Miller continued to take Xanax, Zolpidem Tartrate (Ambien), and Lipitor, and now also takes Wellbutrin for her depression, Bisoprolol, Trandolapril and Spironolactone for her high blood pressure, and Anastrozole as continued treatment for her breast cancer. The record shows that on March 2, 2013, Dr. Soto sent a doctor's note certifying that Miller was his patient and that her echocardiogram showed and left ventricular ejection fraction of 30 percent. (Tr. 519).

Lab reports from LabCorp on April 10, 2013, showed that Miller's cholesterol remained high with an LDL cholesterol level at 114, and a total cholesterol level at 210. (Tr. 586).

On May 28, 2013, Dr. Prabhu completed a "12.04 Affective Disorders" and "12.06 Anxiety Disorders" disability assessments. (Tr. 521-28). In the 12.04 assessment, Dr. Prabhu noted that Miller displayed a "disturbance of mood accompanied by a full or partial manic or depressive syndrome" characterized by a pervasive loss of interest in almost all activities, sleep disturbance, agitation, decreased energy, feelings of guilt or worthiness, difficulty concentrating, and passive thoughts of suicide. (Tr. 521). In the 12.06 assessment, Dr. Prabhu noted that Miller's anxiety was accompanied by motor tension, autonomic hyperactivity, or apprehension expectation, that Miller had a persistent irrational fear of a specific object, activity, or situation which would result in a compelling desire to avoid it, recurrent severe panic attacks manifested by sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on average of at least once a week, and recurrent and intrusive recollections of a traumatic experience (Tr. 522). In rating Miller's functional limitations attendant to her depression and anxiety, Dr. Prabhu concluded that Miller has marked restrictions of activities of daily living, marked difficulties maintaining social functioning, extreme deficiencies of concentration, persistence or pace, and four or more repeated episodes of decompensation, each of extended duration (Tr. 523). Dr. Prabhu also concluded, with respect to Miller's depressive disorder, that Miller had a medically documented history of a chronic affective disorder of at least two-year duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms attenuated by medication or psychosocial support, with: (1) repeated episodes of decompensation each of extended duration; (2) a current history of an inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement, and (3) a residual

disease process resulting in a marginal adjustment that an increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. (Tr. 524). With respect to Miller's anxiety disorder, Dr. Prabhu determined that it resulted Miller's complete inability to function independently outside the area of her home. (Tr. 525).   A Mental Residual Functional Capacity Assessment completed by Dr. Prabhu on that same date, generally aligned with Dr. Prabhu's other opinions, with Dr. Prabhu indicating that Miller was "markedly limited" in: the ability to remember locations and work-like procedures; the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or proximity to others without being distracted by them; the ability to make simple work-related decisions; the ability to complete a normal workday and work week without interruptions for psychologically base symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to get along with coworkers or peers without distracting then or exhibiting behavioral extremes; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to respond appropriately to changes in the work setting; the ability to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others (Tr. 526-528).

On June 5, 2013, Dr. Jalal designated Miller's cardiac symptomatology as Class III in accordance with the American Heart Association Functional Capacity classification list. (Tr. 529). Class III is described as patients with cardiac disease resulting in marked limitation of physical

activity but are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea or anginal pain. Walking more than one level block, climbing one flight of stairs or the usual activities of daily living do produce symptoms.

On July 5, 2013, Miller returned to Dr. Jalal's office, complaining of pain in her neck and shoulder, and palpitations three to four times a week associated with anxiety. (Tr. 593). Dr. Jalal found no evidence of arrhythmia and her comprehensive metabolic panel reported a left ventricle ejection fraction of 30-35 percent. She continued to take Bisoprolol, Wellbutrin, Anastrozole, Zolpidem Tartrate, Xanax, Trandolapril, Spironolactone, and Crestor. Miller visited Dr. Prabhu again on July 16, 2013, at which time she told him she had been having serious medical problems. Dr. Prabhu reported on that date that Miller she was alert and oriented, logical and goal oriented, depressed but had behavior within normal limits (Tr. 590).

On August 7, 2013, Miller returned to Memorial Hermann Medical Group to see Dr. Soto for her six-month follow up. (Tr. 597). She denied any chest discomfort, chest pain, dizziness, fainting, nausea, night sweats, palpitation, vomiting, and shortness of breath. Dr. Soto reported normal S1 and S2, regular heart rate and rhythm, and no murmurs, gallops, rubs, or clicks. (Tr. 598). Dr. Soto found that her chronic systolic heart failure, left bundle branch block, and defibrillator implantation were all stable. Miller had her Bisoprolol Fumarate, Mavik, Crestor, and Spironolactone prescriptions refilled during this visit.

On January 2, 2014, Miller was seen by Dr. Jalal for her second six-month follow up (Tr. 628). She denied any chest pain, shortness of breath, edema or syncope, but did say she had occasional dizziness and palpitations. Dr. Jalal's progress notes report that her heart was well compensated, and her congestive heart failure functional class rose from a class III to a class I-II. In addition, her blood pressure was well controlled, and her defibrillator was functioning normally. One week

later, on January 9, 2014, Miller returned to Dr. Prabhu's office (Tr. 637-39), and reported that she had "been having trouble getting motivated" and felt depressed. She also discussed her issues with her lending institution, being denied a loan, and how this increased her depression. (Tr. 637).  The record does not show any detailed notes on Dr. Prabhu's part concerning this visit, but he did maintain that Miller still had a panic anxiety disorder and depression.

On February 5, 2014, Miller when to see Dr. Soto for a follow up echocardiogram. (Tr. 825). She denied any chest discomfort, chest pain, dizziness, fainting, fatigue, fever, nausea, fainting, palpitations, shortness of breath, orthopnea, and vomiting. The echocardiogram taken that day showed normal left ventricle wall motion with an ejection fraction of at least 65 percent and no abnormal septal motion.

While Miller's heart was beginning to show improvement, her cholesterol remained high. Test results from LabCorp on April 3, 2014, revealed her cholesterol level at 207 and triglycerides level at 150. (Tr. 768).  On June 8, 2014, Miller returned to Dr. Jalal for a follow up and implantable cardioverter-defibrillator check. Miller denied any chest pain, palpitations, shortness of breath, dizziness, leg edema or syncope. (Tr. 625). Dr. Jalal noted in his progress notes that Miller was in the functional class II, and that her heart failure was improving but advised her to continue present heart failure therapy. (Tr. 626).

Miller's hyperlipidemia persisted into 2015. Lab results from LabCorp on January 9, 2015 reported her total cholesterol level at 218, and LDL cholesterol level at 113. (Tr. 766). On January 12, 2015, Miller saw Dr. Jalal for her 24-month quad check. (Tr. 623). She complained of occasional palpitations and dizziness when she got up too fast, shortness of breath with exertion, but denied having any chest pain or leg edema. There we no discernible notes on Dr. Jalal's part on this visit, but he did schedule another follow up in six months. (Tr. 624). The next day, Miller

14

returned to Dr. Prabhu's office for an appointment. (Tr. 645). Dr. Prabhu found that Miller was still depressed. (Tr. 647). On February 11, 2015, Miller went to see Dr. Iyad N. Daher, M.D. ("Dr. Daher") at Cardiovascular Medicine Associates, P.A. to fill in as her new cardiologist. At the time, she had no congestive heart failure symptoms and no recent change in medication. (Tr. 681). Dr. Daher reported in his assessment that Miller's functional status appeared normal, but was unclear about her current ejection fraction, cardiac function, and blood pressure control. (Tr. 682). He scheduled her for another follow up on March 4, 2015.  At that follow up, Miller told Dr. Daher that she had some early orthostatic symptoms like, but overall felt better and had no shortness of breath. (Tr. 722).  Dr. Daher stated in the assessment note that Miller's blood pressure was controlled, he stopped the Crestor prescription, and switched out Bisoprolol to Coreg.

On June 9, 2015, Miller attended another appointment with Dr. Prabhu. (Tr. 652). Miller stated she was feeling depressed due to problems she had with her insurance. Dr. Prabhu reported Miller's major depression and anxiety disorder as active diagnoses. (Tr. 653). Additionally, the record indicates Miller also went to see Dr. James R. McClamroch, M.D. ("Dr. McClamroch"), an internist, that day. (Tr. 851). Dr. McClamroch reviewed Miller's echocardiogram, which showed normal left ventricle size and wall motion, left ventricle ejection fraction of 55-60 percent. He also stated in the record that she was stable with class II congestive heart failure, which was well compensated after medical therapy and told her to continue current medications.  In addition, Dr. McClamroch reviewed Miller's lab work, which showed an increase of her LDL cholesterol from 120 on Crestor to 160 on Pravastatin.

Miller went to see Dr. Daher on June 15th for her follow up. (Tr. 675). She told Dr. Daher that she was doing fairly and was exercising on a treadmill for up to ten minutes at a time but was feeling weak and lightheaded afterwards. She also complained of dizziness upon standing quickly

or for a long time. She did not complain of orthopnea, leg edema, or paroxysmal nocturnal dyspnea. Dr. Daher reported that Miller's blood pressure was controlled, her ejection fraction had improved, and her congestive heart failure compensated to class II symptoms. He also told her to continue current medication to avoid recurrence of symptoms and to restart Crestor. (Tr. 718).

On July 24, 2015, Miller went to see Dr. Daher for a follow up. (Tr. 687). Dr. Daher reported her left ventricle size as normal and her overall left ventricular systolic function as normal with an ejection fraction between 60-64 percent. She followed up with Dr. Daher on August 18, 2015, at which time Miller complained of having episodes of lightheadedness from several times a day to once or twice a week, but her other symptoms were less severe (Tr. 709).

On November 4, 2015, Miller returned to Dr. Prabhu's office and reported lack of energy and motivation, decreased amount of sleep, and having a hard time getting out of bed. (Tr. 663). Dr. Prabhu noted no changes to her overall diagnoses of anxiety disorder and major depression, and continued her on her medication; Xanax, Wellbutrin, Ambien, and Clonazepam. On November 9, 2015, in a follow-up visit with Dr. Daher, Miller's recent labwork was discussed, with her LDL cholesterol levels markedly improved, but still high, and HDL levels optimal (Tr. 669, 671).

Miller returned to see Dr. McClamroch on February 29, 2016. (Tr. 801). She told McClamroch about her depression and having some good and bad days, her worries about finances, and the stress in her life. She told Dr. McClamroch that she occasionally felt some flip-flops in her heart, palpitations, and dizziness especially with standing. However, she denied orthopnea, dyspnea, leg swelling, chest pain or angina. Dr. McClamroch reported marked improvement to Miller's non ischemic cardiomyopathy and cardiac function post medical therapy and implantable cardioverter-defibrillator/cardiac resynchronization therapy. (Tr. 802). There was no volume overload or evidence of congestive heart failure and no apparent arrhythmia at this time. He recommended

Miller to continue her current medical regimen, to follow up with Dr. Jalal on a regular basis, and to monitor her device and rhythm with at-home monitoring.

On April 26, 2016, Miller saw Dr. Prabhu (Tr. 754-57). He reported no changes other than Miller's statement of "doing better," and continued her medications. (Tr. 757). Miller returned to Dr. McClamroch's office for a follow up on June 2, 2016. (Tr. 805). Dr. McClamroch reported her left ventricular size and function were normal with an estimated ejection fraction of 55-60 percent. Her labs that day from Clinical Pathology laboratory, showed that her total cholesterol level was at 258 and her LDL cholesterol was at 160. (Tr. 864). On June 9, 2016, Dr. McClamroch discussed with Miller her echocardiogram which showed normal left ventricle size and wall motion, an ejection fraction of 55-60 percent, and only trivial or mild mitral regurgitation. (Tr. 8571). He deemed her as stable with a class II congestive heart failure, which is well compensated on medical therapy.

On August 26, 2016, Miller saw Dr. Jalal for a follow up and biventricular implantable cardioverter-defibrillator check. (Tr. 859). She complained to him of occasional palpitations and dizziness, but denied; chest pains, shortness of breath, or syncope. Dr. Jalal reported an improved left ventricle ejection fraction estimated at 60 percent, and advised her to continue present medications, exercise, and monitor the pressure. (Tr. 860). Approximately two months later, on November 8, 2016, Miller went to see Dr. Jalal with complaints of occasional palpitations and dizziness, but still denied chest pains, shortness of breath, and syncope. (Tr. 888). Dr. Jalal noted that Miller had a low risk of ventricular arrhythmias given that her left ventricle function was preserved, and her ejection fraction remained at 55-60 percent since 2014. (Tr. 889). He also reported that her heart failure was well compensated and designated her as a congestive heart

failure functional class I. He advised her to continue her present medication and to use a low salt diet.

On March 27, 2017, Miller next saw Dr. Prabhu (Tr. 920). At that visit Miller reported to Dr. Prabhu that she was pre-diabetic, and Dr. Prabhu found her depressed, tearful, and feeling overwhelmed by her medical and financial problems (Tr. 923). Dr. Prabhu continued her diagnoses and her medications.

## VI.     Discussion

Miller raises three issues, but the first one – that the ALJ's determination that she did not meet a Listing is not supported by substantial evidence – is dispositive of this appeal. Miller maintains that the ALJ erred in his assessment of whether she met Listing 4.02 for Chronic Heart Failure and his assessment of whether she met Listing 12.04 or 12.06 for Affected and Anxiety Related Disorders. The ALJ concluded, as follows, that Miller did not meet any of these three Listings:

> The claimant's cardiomyopathy/congestive heart failure does not meet or medically equal Listing 4.02 because there is no evidence of systolic failure with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability or diastolic failure with left ventricular posterior wall plus septal thickness totaling 2.5 c, or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability, and resulting in persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living, or three or more separate episodes of acute congestive heart failure within a consecutive 12-month period or inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less.

> The severity of the claimant's mental impairments does not meet or medically equal the criteria of listing 12.04 and 12.06. In making this finding, I have considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairment must result in at least one extreme or two marked limitations in a broad area of functioning, which are: understanding, remembering or applying information; interacting with others; concentrating, persisting or maintaining pace; or adapting or managing themselves. A marked limitation means

functioning in this area independently, appropriately, effective, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.

In understanding, remembering, or applying information, the claimant has mild limitations. She does not need reminders to take medication. The claimant is able to prepare simple meals, do laundry, drive a car, go out alone, shop in stores and by computer, and handle finances. She is able to complete tasks and follow instructions. She uses reminders such as writing things down and leaving her medication in different places (Exhibit 4E at 5-7, 8; 7E at 5-7, 8).

In interacting with others, the claimant has mild limitations. The claimant is able to spend time with friends and family, exercises and travels (Exhibit 4E at 5-7; 7E at 5-7).

With regard to concentrating, persisting or maintaining pace, the claimant has moderate limitations. The claimant is able to prepare simple meals, do laundry, drive a car, go out alone, shop in stores and by computer, and handle finances. She is able to complete tasks and follow instructions. She uses reminders such as writing things down and leaving her medication in different places (Exhibit 4E at 5-7, 8; 7E at 5-7, 8). The claimant has difficulty handling stress, and takes her time to adjust to changes in routine (Exhibit 4E at 9).

As for adapting or managing oneself, the claimant has experienced mild limitations. The claimant stated in a Function Report that she is able to care for her personal hygiene and grooming, but sits when dressing due to difficulty standing. (Exhibit 4E at 4; 7E at 4). She does not need reminders to take medication. The claimant is able to prepare simple meals, do laundry, drive a car, go out alone, shop in stores and by computer, and handle finances. The claimant is able to spend time with friends and family. (Exhibit 4E at 5-7; 7E at 5-7).

Because the claimant's mental impairment does not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

I have also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

(Tr. 13-14).

The ALJ's determination with respect to Listing 4.02, at least with regard to the twelve month period between December 2012 and January 2014, is not supported by substantial evidence. Listing 4.02 provides for presumptive disability as follows:

**A.** Medically documented presence of one of the following:

1. Systolic failure, with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or

2. Diastolic failure, with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);

      AND

**B.** Resulting in one of the following:

1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12-month period, with evidence of fluid retention from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization; or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a. Dyspnea, fatigue, palpitations, or chest discomfort; or

b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.02.  Here, the record evidence shows that Miller, prior to

February 2014, had an ejection fraction of around 30% (Tr. 511-513; 539-540; 519; 593; 825).

While the ALJ concluded that Listing 4.02 was not met because there was "no evidence of systolic

failure with left ventricular ejection fraction of 30% or less... during a period of stability within a consecutive 12-month period" (Tr.13), that statement is not supported by the record evidence. The objective medical evidence in the record is that Miller had an ejection fraction of 30-35% or less, from December 6, 2012 through the time it was determined, in February 2014, to have substantially improved. The ALJ's determination that Listing 4.02 was not met, for any continuous 12 month period following Miller's alleged onset date of August 9, 2012, is not supported by substantial evidence.

As for Listings 12.04 and 12.06, the ALJ was specifically instructed by the Appeals Council to more fully evaluate Miller's mental impairments. He did not do so. Instead, he, like the ALJ before him, gave short shrift to Dr. Prabhu's opinions (and only did so in considering Miller's RFC), and merely "cherry-picked" some objective medical findings over the course of Dr. Prabhu's more than four years of treatment notes, to identify as a basis for rejecting Dr. Prabhu's opinions. In addition, as argued by Miller, the ALJ completely disregarded, at step three, Dr. Prabhu's opinions, and instead solely relied on the contents the Function report Miller completed for the Social Security Administration on January 28, 2013. It goes without saying that Dr. Prabhu was Miller's treating physician both before and after her alleged disability onset date of August 9, 2012. It also goes without saying that Dr. Prabhu, as a psychiatrist, is a specialist, whose opinion is generally entitled to even more weight than that of a treating, generalist, physician. *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). Here, not only did the ALJ wholly fail to evaluate Dr. Prabhu's opinions at step three, he failed to evaluate Dr. Prabhu's opinions, by reference to the record as a whole, in determining Miller's RFC, and then further failed to contact Dr. Prabu about his opinion, or seek a consultative psychiatric evaluation of Miller, as the Appeals Council suggested may be

necessary. Upon this record, where the ALJ's rejection of Dr. Prabhu's opinions does not conform

with the requirements discussed by the Fifth Circuit in *Newton v. Apfel*, 209 F.3d 448 (5th Cir.

2000),[2] it cannot be said that the ALJ's determinations -- that Miller did not meet or equal Listings

12.04 or 12.04, and that Miller retained the mental residual functional capacity to "understand

detailed instructions, concentrate[s] and perform[] detailed tasks, respond[] and adapt[] to

workplace changes and supervision" -- are supported by substantial evidence. Remand is therefore

warranted for the ALJ to: (1) re-evaluate whether Miller ever met Listing 4.02, 12.04 and/or 12.06,

from her alleged onset date forward; and (2) re-evaluate Miller's depression and anxiety disorder

and the affect they have on her residual mental capacity, by reference to her treating psychiatrist's

opinion(s) and, if necessary, by and through a consultative psychiatric evaluation.


### VII.    Conclusion and Recommendation

Based on the foregoing, and the conclusion that the ALJ's decision is not supported by

substantial evidence, and is based on an incomplete assessment of the opinions of Plaintiff Pamela

Miller's treating psychiatrist, the Magistrate Judge

---

[2] Under 20 C.F.R. § 404.1527(d)(2), consideration of a treating physician's opinion must be
based on:
| | |
|---|---|
| (1) | the physician's length of treatment of the claimant, |
| (2) | the physician's frequency of examination, |
| (3) | the nature and extent of the treatment relationship, |
| (4) | the support of the physician's opinion afforded by the medical evidence of record, |
| (5) | the consistency of the opinion with the record as a whole; and |
| (6) | the specialization of the treating physician. |

*Newton*, 209 F.3d at 456.

RECOMMENDS that Plaintiff's Motion for Summary Judgment (Document No. 15) be GRANTED, Defendant's Motion for Summary Judgment (Document No. 13) be DENIED, and that this proceeding be REMANDED to the Commissioner for further proceedings.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within fourteen (14) days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed. R. Civ. P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), cert. denied, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996). The original of any written objections shall be filed with the United States District Clerk.

Signed at Houston, Texas, this ___12th___ day of August, 2019.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE

23